Johnston, Judge.—
Some years before the American revolution, Robert Palmer, who was seized and possessed of the premises in question, removed to England, and settled in London, where he continued to reside to this time, leaving in this country his eldest son William Palmer, who became a citizen of this state, and since the *179 revolution died, in the life time of his father, leaving the plaintiff Mary, his widow, and several children. By his will, duly executed, he devised the lands in question to the said Mary, who, afterwards intermarried with William Faris.
By an act of the legislature, passed in their session of November, 1777, ch. 17, it is enabled, that " all the lands, &c. of which any person was " seized or possessed, or to which any person " had title on the 4th day of July, 1776, who still on the said day was absent from this and every " part of the United State, and who still is ab- “ sent from the same, &c, and still resides be- " yond the limits of the United States, shall and " are hereby declared to be confiscated to the " use of this state; unless such person shall, at " the next general assembly which shall be held " after the 1st day of October, in the year 1778, " appear, and by the said assembly be admitted " to the privilege of a citizen of this state, and " restored to the possession and property which " to him once belonged within the same.”
The first assembly after the 1st day of October, 1778, was held in January, 1779, who passed an act to carry the act of November, 1777, into effect. After setting forth in the preamble that " whereas many persons who come within the " description of the aforesaid act, or some one “ of them, have failed or neglected to appear " before the general assembly, during the present " session, and submit to the state whether they " shall be admitted citizens thereof, and restored " to the possession which to them once belonged; " whereby all such persons have clearly incurred, " and are become liable to the penalties of the *180 " aforesaid act;”—the assembly then goes on to enact, " That all the lands, &c. of every person " and persons who come within, or are included " within the description of the aforesaid act, or " either of them, shall be, and are hereby de- " clared to be forfeited to the state, and shall be “ vested in the same, for the uses and purposes " hereinafter mentioned, and for no other pur- " poses whatsoever.”—Commissioners are appointed, and by the sixth section of the act they are directed, among other things, to let the lands, and by a proviso to that section, it is provided, " nevertheless, that the child or children of such " absentee or absentees, now in or under the pro- " tection of this state, shall be allowed so much " of the estate of such absentee or absentees, as " such wife, child or children, might have en- " joyed and have been allowed, as if such absen- " tee had died intestate in this state, or any of the " United States."
Robert Palmer was one of those who did not appear before the general assembly, and claim the privilege of becoming a citizen—Wm. Palmer was his elder son, and would have been his heir at law, and entitled to the inheritance of the premises, if his father had died in this state, or any of the United States.—The plaintiffs claim under the proviso above recited.
In October, 1779, the assembly passed another act to carry into effect the act passed at Newborn in November, 1777. The preamble to this act declares, that whereas, &c. (the same as in the act of January the same year) and enacts, " that all the lands, &c, of Robert Palmer, and " a number of others, whose names are enume- *181 “ rated, which all or either of the persons afore- " said may have had on the 4th of July, 1776, " or at any time since, shall be, and are hereby " declared to be confiscated, fully and absolute- " ly forfeited to this state, and shall be vested in " the hands of commissioners, for the purposes " after mentioned.”
By the 7th section of this act, the commissioners are empowered to sell the lands, &c. and execute conveyances to the purchasers.
By the 16th section of the same act, the act of January, 1779, and every clause of it, is repealed and made void, any law to the contrary notwithstanding.
The defendant became a purchaser under this act, or the act passed in April, 1782, ch. 6, nearly to the same purpose as the above, and obtained a conveyance from the commissioners, duly executed, under which he claims.
It is first to be considered, by what authority the assembly assumed a power to seize upon and appropriate to the public or any other use, the lands of individuals. For this information, it is necessary to have recourse to the fundamental principles of our government, as laid down in the bill of rights and constitution. from which alone they derive all the powers and authorities which they have a right to exercise over the persons and property of the citizens, either collectively or individually.
The bill of rights, section 25, after describing the boundaries of the state declares, " that the *182 “ territories, seas, waters and harbours, within " the boundaries therein delineated, are the right " and property of the people of this state, to be “ held in Sovereignty, &c.”
To this general declaration there are some reservations and exceptions—of these, it is only necessary to attend to the third proviso, as follows : " And provided further, that nothing herein con " tained shall affect the tides or possessions of in- " dividuals holding or claiming under the laws " heretofore in force, or grants heretofore made " under king George III. or his predecessors, " or the late lords proprietors,, or any of them.”
By the declaratory part of this section, the people of this state assume to themselves, collectively, the right of property of all the lands within the boundaries of the state, not heretofore appropriated ; and thereby disclaiming all right to interfere with the right of property heretofore vested in individuals, in the manner described in the proviso above. It is evident, that by this proviso the titles of individual citizens of this state are secured to them, and placed out of the power of the collective body of the people ; and consequently no act of their representatives in the general assembly, could divest or impair the titles which they held, under royal or proprietory grants, before the revolution, or the existence of our present government; and any act which might be unadvisedly or arbitrarily made to that purpose, would be a mere nullity, and would fall prostrate before the bill of rights, which is paramount to acts of the assembly, and exercises a controuling power over them, as often as they exceed the bounds prescribed to them by that *183 instrument, which should ever be held sacred and inviolable, as the best security of our civil rights, against the assumption of tyranny and despotism; such an act should not, and ought not to have any weight to influence a decision in any court of judicature.
It is then to be considered how far this proviso or saving can have any influence or tendency to establish or see me the titles of others than citizens, from the assumption and appropriation of the legislature.
The declaratory or enabling part of the clause regards the citizens, or body of the people collectively, within the boundaries therein described, and confers no territorial rights except to them; the saving in the proviso, is to secure to the individuals of that collective body of the people, their separate and individual titles to their lands, but cannot, as I apprehend, mean or intend to secure titles to lands, or vest interests in individuals, not individuals of the collective body of the people of this state, but aliens and foreigners who had never become parties to the compact on which our government was formed, nor residing within the limits of its territory.
There were, however, at that time, certain persons, our former fellow-subjects, inhabitants of the state, who had not acceded to the revolution, and who never became parties to the social compact, who by the law of nations had, not-withstanding, a right to sell and dispose of their lands, and remove their property—See Vattel book 1, ch. 3, sec. 33.—The act of April, 1777, ch. 3, delineates who are considered citizens of *184 this state, or, as they express it, " owe allegiance to the state;" and in the same act, declare it necessary that all persons who owe or acknowledge allegiance or obedience to the king of Great-Britain, and refuse to take an oath of allegiance to this state, within a limited time up should be removed out of the state, allowing them to sell their lands, and remove their effects, and if not sold within a limited time, to be forfeited to the state. As the persons above described were in habitants of the state at the time of the declaration of American independence, and at the time when the constitution and bill of rights were adopted, they might perhaps be considered to come within the proviso, and the titles to their lands continued to be vested in them, till they declared their election either to become members of the state, or to adhere to the royal government; which election they had a right to make, agreeably to the law of nations, (see the authority above referred to). During that interval, they might sell or dispose of their lands; but as soon as they had made their election in favour of the old government, and by that dis claimed any connection with the government established by the new constitution, they were deprived of all the privileges which accrued from it, unless under such indulgence as might be extended to them by the legislature, in whom, as representatives of the people, the right of disposing of the public property, under such limitations and restrictions as they thought proper, were vested.
It is now to be considered whether William Palmer, under whom the plaintiff's claim, was *185 at any time seized, or had any title in law to the premises.
At the time of the declaration of rights, and adoption of the constitution, Robert Palmer, being an alien, could not, as I conceive, acquire or hold any rights from them—he could not have acquired a title to any lands in this state for himself—all which he acquired by purchase or descent, would be vested for the use of the state, who might at any time lay her hands upon them, if he had died after that period, even before any act for confiscating his property had passed—his heir at law, though a citizen of this state, could not have taken by descent, because his ancestor did not die seized; the premises having, agreeably to the principles above laid down, vested in the citizens of this state; and to entitle the heir, he must claim as heir to him who was last seized. Therefore William Palmer, and they who claim under him, to entitle them to a recovery in this case, must derive a title from the state.
The only colour of title shewn by the plaintiffs, is the 6th section of the 5th chapter of the act of January, 1779—the words are, “ shall be allowed;” which seem to refer to some future act, to be executed by the state. Upon a claim being exhibited and admitted, there is no authority delegated by the act, to any one to examine the claim, and carry into effect the intentions of the legislature—the legal estate continued to be vested in the public, and could not be divested but by an actual conveyance or transfer, directly vesting it in some individual in words of the present tense—but words such as those used *186 in the proviso, in the future tense, cannot convey or vest the title of an estate; at most they amount only to a promise, and such a promise as in the case of a private person would not perhaps be binding in equity, as it was made without any valuable consideration. And yet, as it was made by so high and respectable an authority, and under such circumstances as it appears to me, should have been held sacred and inviolable, and most conscientiously complied with and fulfilled.
The circumstances I allude to are these : that absentees who were at a great distance, perhaps aged and inform, might probably rest contented that their property should be enjoyed by those who would be entitled to it after their death, which they might consider at no very distant period.
The act however which passed in October, 1779, having revoked the promise of the state, if it can be considered as a promise, by repealing the act of January, and declaring, it null and void before any steps were taken substantially to carry their intention into effect, the claim of William Palmer was annihilated, and no longer existed either in law or equity, and the purchase under the last act stands good and valid.
Therefore I am of opinion that judgment be entered for the defendant.
If it should be considered that the words in the proviso to the 25th section of the bill of rights, saving the titles or possessions of individuals, being general, extends to secure the titles *187 of all persons, as well aliens as citizens, who claim under royal or proprietory grants, then Robert Palmer is included within the saving clause, and was not divested of his title ; nor had the Assembly any right to appropriate his lands, which I do not admit; yet the plaintiffs in such case cannot recover, having derived no title from him.
Taylor, Judge.—
In order to render the opinion which I am about to deliver as perspicuous as possible, I will state the substance of those confiscation laws which relate to the present question; the first, which was passed in 1777, comprehends three descriptions of persons.
1st. Those who on the 4th July, 1776, were absent from the state, and the United States, and continued absent when the law was passed.
2d. Those who at any time during the war, attached themselves to, or abetted the enemies of the United States.
3d. Those who have withdrawn themselves from the state, or any of the United States, since the 4th July, 1776, and still continue beyond the limits of the United States.
Of all such persons the property is declared to be confiscated, unless they shall at the next General Assembly which shall be held after the 1st October 1778, appear and be admitted to the privileges of citizens, and restored to the property which once belonged to them.
The second, passed in January, 1779, to carry the former into effect, after reciting in the *188 preamble, that many persons within the description of the first had failed to appear, declares that all the real and personal estates of such persons shall be forfeited to the state, and vested in the same for the uses expressed in the act. The act then proceeds to direct the appointment of commissioners, and to prescribe their duties, with respect to renting the real, and selling the personal estates ; and to the 6th section is added this proviso: “ That the wife, child or children of " such absentee or absentees, now in or under “ the protection of this or the United States, " shall be allowed so much of the estate of such " absentee or absentees, as such wife, child or " children might have enjoyed, and have been " allowed, if such absentee had died intestate in " this state, or any of the United States.”
The third act passed in October, 1779, recites that many of the persons coming within the description of the former, have failed or neglected to appear, according to the requisitions of the first act, whereby they have clearly incurred and become liable to the penalties of the first act. The persons who have thus clearly incurred the penalties of the said act, are then enumerated; and among them Robert Palmer is specially named. The 16th section repeals and makes void the act passed in January, 1779. The 17th section reserves to the wives and widows of the described persons, who reside within the state, the right of dower, and directs that a proper subsistence should be allowed to them out of the sales of their husband’s estates, for themselves and the minor children who reside in the state. The quantum of the allowance is however to be ascertained by the Assembly. The confiscation laws *189 subsequently passed, have no other connection with the case before the court, than being parts of one system; they may occasionally serve to explain and illustrate the intention of the legislature.—The plaintiff sets up a title to the premises under William Palmer, who, it is said, as eldest son of Robert Palmer, became seized by the operation, of the proviso contained in the law of January, 1779. If under that clause, he acquired a clear and obvious title, a very interesting inquiry would arise, to ascertain how far it was affected by a subsequent repeal of the act: a question which may perhaps, on investigation, appear to be embarrassed with new and peculiar difficulties, on account of the manner in which repealing clauses are worded, almost uniformly throughout our statute book. That rights acquired, or acts done, under a statute, while it remains in force, continue unimpaired and valid, notwithstanding its subsequent repeal, is a well known principle of law; but it seems to be different when a former act is declared to be null and void. The view I have of the present case, does not require me to give any opinion on this point, though I confess that nothing short of the clearest conviction would induce me to decide, that a title acquired by the proviso was taken away by the subsequent act: because, upon the supposition that Robert Palmer’s estate was confiscated by the law of January, 1779, the proviso for his resident children is founded in the clearest principles of justice, and not forbidden by any obvious reasons of policy. To rescue innocence from the punishment denounced against delinquency; to combine the indispensible measures of self-preservation, with a beneficent regard to the rights of humanity, were objects *190 highly becoming the legislative character, and they have been accordingly attended to in all the laws upon this subject, though the modes have been varied according to the urgency of the times. To a greater or less degree the principle has been kept in view throughout the whole system: peccata suos teneant auctores; nec ulterius progrediatur metus, quam reperiatur delictum. No law provides so amply for the children as that of January, 1779; no other gives them that portion, of their father’s estate, which they would have inherited in case of intestacy: it would therefore, be most agreeable to discover satisfactory grounds upon which to decide in favour of a title claimed under this proviso. But the right being claimed, as one strictly legal, and created by a positive law, it must appear to be so to those who are required to give it judicial sanction. The principal question then is, was the estate of Robert Palmer confiscated by the act of January, 1779? If the affirmation of this question should be established, two others naturally arise in the case, viz. Whether the terms of the proviso are sufficiently operative to vest an immediate seisin in William? And lastly, if they were, then whether it was divested by that law being subsequently repealed and made void? Upon the latter question it is unnecessary for me to give an opinion, because I think no confiscation in the particular case was effected by the act. The freehold must have been divested from Robert Palmer before it could be granted by the state to William; but a legislative declaration, that a certain description of persons had incurred the penalties of the law, and that their estates were thereby confiscated, could not of itself effect a silent transfer of their property. Such an act *191 must, from its very nature, be inchoate, and fall short of its object, until the property of the persons described be seized, as having incurred the forfeiture. To determine whether a person’s conduct had been such as the law intended to punish, and to ascertain what property in consequence thereof had accrued to the public, various methods might have been devised: and probably that adopted by the act was no less effectual than any other. Whatever steps are directed to be taken for this end, should have been pursued, and in the manner prescribed. They were essential to impart to the law its intended rigour and operation; and this will be more apparent, when the directions and different modes of proceeding are particularly examined. Commissioners are to be appointed, who are to give bond, and perform their duties under the sanction of an oath: They are to take possession of their property for the use of the state; to enter in a book the property which has come to their knowledge or possession, with the names of the former owners, and whether there are any adverse claimants; and they are to report their proceedings to the county court. If any citizen of the state, or of the United States, puts in a claim to the lands, the proceedings of the commissioners are to be transmitted to the superior court, where the question is to be finally determined. If any persons having a claim do yet neglect to exhibit it before the county court, and their property is in consequence wrongfully sold, the assembly is to reimburse them. These, and other things contained in the law, were so many qualifications to the general confiscatory clause, and necessary to determine when and how they should operate. They furnish a proof that the legislature had in *192 view that principle of the common law, that the state can neither take nor give lands, without same solemn and authentic act, or matter of record. The requisite degree of certainty and solemnity was contemplated in the discharge of the several duties assigned to the commissioners—It is said in Page’s case 5, Co. 53, " There are “ two manner of offices; one that vesteth the “ estate and possession of the land in the state, " when it hath not any right or title before, and " that is called an office of entitling, as in case of purchase by an alien, &c. There is ano- “ ther office, and that is called an office of in- " struction; and that is where the estate of the " land is lawfully in the state before, but the " particularity of the land doth not appear on “ record, so that it may be put in charge.”—An attainder for treason is put by the writer as an example of the latter kind; and the nature of that when examined, shews that the proceedings directed by the act in question, ought to be viewed as an office of entitling. By the English law, an attainder follows either from the judgment of outlawry or of death, in cases of treason and felony; or it is created by an act of parliament, passed for the very case. In the first instance, the forms of proceeding being regulated by pre-existent laws, require the utmost certainty and precision—in the latter, the penalties of an attainder are invariably inflicted upon the offenders by name; and that some degree of certainty is necessary in this respect, appears from Fort. 86. By whatever means therefore an attainder arises, it is a solemn and notorious act, specific in its object, personal in its direction, and not requiring the aid of other circumstances to complex a divestiture.
*193 It does not appear from the special verdict, that any proceedings whatever were had against Robert Palmer’s estate under this law; and thence I think it follows, that the title continued in him until the act of October, 1779, when he was specially named, and his estate confiscated. The act itself may be regarded as a proof that the legislature entertained the same opinion: For if Robert Palmer’s estate was effectually confiscated by the first law, where was the necessity of passing another for the same purpose ? If the first divested all his estate, there was nothing left upon which the latter could operate; for it seems he was absent from the country in the intermediate time. Nor is this kind of proof weakened by the supposition, that the latter act; may operate upon such property as was not disposed of to William by the first, such as the dower of the wife, or the share of a child not resident. This is a assuming what no reasonable construction of the act will warrant; namely, that so much of the property as was not allotted to William, as a resident child, remained in Robert. The law either amounted to a confiscation, or it did not; if it did, then two thirds of the real, and a share of the personal estate, were to be allowed to William; the other third of the real, and the shares of the personal, would clearly belong to the state, if there were no resident children. In either case nothing remained to Robert; for the nature of a proviso is to except something from the operation of the purview, which must otherwise have been subject to it.
After what has been stated, it would be almost unnecessary to add, that in my opinion the real estates of those persons who were the ob *194 jects of the confiscation acts, were not divested by the declaration of rights—that instrument had a very important operation in vesting in the people of the state, certain rights appertaining to tenure, which were before in the king and lords proprietors; but the individual titles derived from others were not, I think, meant to be affected. —Judgment for the defendant.
Judge Macay gave no opinion in this case, being interested in some lands claimed by the lessors of the plaintiffs. Upon the same grounds Judge Hall gave no opinion, because he had not been appointed till after the opinions of the other judges had been made up.